Rosemary Amezcua-Moll SBN 223875
    Rose@amalaw.net
Sarah J. Nowels, SBN 273471
    Sarah@amalaw.net
AMEZCUA-MOLL & ASSOCIATES, P.C.
1122 East Lincoln Avenue, Suite 203
Orange, CA 92865
Telephone: 714-288-2826
Facsimile: 714-464-4536

Attorneys for Chapter 7 Trustee, RICHARD A. MARSHACK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No.: 8:16-bk-12895-ES |
| 29 PRIME, INC., | Adv. No.: 8:16-ap-_____ - ES |
| Debtor. | COMPLAINT FOR: |
| | (1) Breach of Fiduciary Duty – Derivative; |
| RICHARD A. MARSHACK, Chapter 7 Trustee, | (2) Constructive Trust |
| Plaintiff, | **DEMAND FOR JURY TRIAL** |
| vs. | |
| RUSSELL B. WALLACE, an individual; TONY REDMAN, an individual; JASON MARTIN, and individual; HALEH FARDI, an individual; LOCAL ZOOM, INC., a California Corporation; OC LISTING, INC., a California Corporation; and SKY MOTORSPORTS, INC., a California Corporation; 1Network, Inc., entity status unknown | |
| Defendants. | |

TO THE HONORABLE ERITHE A. SMITH, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND ALL OTHER INTERESTED PARTIES:

1    Richard A. Marshack, in his capacity as Chapter 7 Trustee ("Trustee" or "Plaintiff") of the

2    Bankruptcy Estate ("Estate") of 29 Prime, Inc. ("Debtor" or "29 PRIME") files this Complaint

3    against RUSSELL B. WALLACE, an individual; TONY REDMAN, an individual; JASON

4    MARTIN, and individual; HALEH FARDI, an individual; LOCAL ZOOM, INC., a California

5    Corporation; OC LISTING, INC., a California Corporation; SKY MOTORSPORTS, INC., a

6    California Corporation; and 1Network, Inc., entity status unknown and alleges as follows:

7                                        **JURISDICTION**

8    1.    On July 8, 2016, the Debtor filed a voluntary petition under Chapter 7 of Title 7 of

9    the United States Code.

10   2.    This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A)

11   (matters concerning the administration of the estate), and (O) (other proceedings affecting the

12   liquidation of the assets of the estate).   To the extent any claim for relief contained herein is

13   determined to be a *Stern*-claim or not a core proceeding, Plaintiff consents to entry of final

14   judgment and orders by the Bankruptcy Court.

15   3.    This adversary proceeding is filed pursuant to 11 U.S.C. §§ 550(a)(1), 1107(a), and

16   California Code of Civil Procedure §§ 309(a), 316(a) & (b), 339(1) & 343.

17   4.    Plaintiff, as the Chapter 7 Trustee of the Debtor's' bankruptcy Estate, is the sole

18   and exclusive party with standing to bring this action pursuant to 11 U.S.C. § 323.

19   5.    This Court has jurisdiction over the above-captioned adversary proceeding

20   pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334 in that this civil proceeding arises in and relates

21   to the bankruptcy case pending in the United States Court for the Central District of California,

22   Santa Ana Division, entitled In re 29 Prime, Inc., assigned Case No. 8:16-bk-12895-ES.

23   6.    Venue properly lies in the Central District of California in that this adversary

24   proceeding arises in, arises under, or is related to a case under Title 7 of the United States Code as

25   provided in 28 U.S.C. §§ 1408 and 1409.

26   ///

27   ///

28   ///

2

COMPLAINT

**PARTIES**

7.     The Plaintiff is the duly appointed and acting Chapter 7 Trustee of the above-entitled Estate under 11 U.S.C. § 702.

8.     At all times herein mentioned, 29 PRIME, INC. was, a corporation duly organized and existing under the laws of the State of Nevada, with its principal place of business believed to be located at: 9810 Irvine Center Drive, Ste. 100, Irvine, CA 92618. 29 PRIME, INC.'s current status is "revoked."

9.     Defendant OC LISTING INC. ("OC LISTING") is, and at all times relevant to this complaint was, a California corporation with primary business offices located at 9810 Irvine Center Drive, Ste. 100, Irvine, CA 92618.

10.     Plaintiff is informed and believes and based thereon alleges that Defendant RUSSELL WALLACE ("WALLACE") was, and now is, a resident of the County of Orange, State of California. WALLACE is the controlling shareholder of 29 PRIME and exercises complete control over OC LISTING acting as President of OC LISTING.

11.     Plaintiff is informed and believes and based thereon alleges that Defendant TONY REDMAN ("REDMAN"), an individual, was, and now is, a resident of the County of Orange, State of California. REDMAN is a shareholder in 29 PRIME and acts as an officer for OC LISTING. On information and belief, REDMAN is a shareholder in OC LISTING.

12.     Plaintiff is informed and believes and based thereon alleges that Defendant JASON MARTIN ("MARTIN"), an individual, was, and now is, a resident of the County of Orange, State of California. MARTIN is a shareholder in 29 PRIME and acts as an officer for OC LISTING. On information and belief, MARTIN is a shareholder of OC LISTING.

13.     Plaintiff is informed and believes and based thereon alleges that Defendant HALEH FARDI ("FARDI"), an individual, was, and now is, a resident of the County of Orange, State of California. FARDI is or was the Chief Financial Officer of OC LISTING and holds herself out as the Chief Financial Officer of 29 PRIME.

14.    Defendant LOCAL ZOOM, INC. ("LOCAL ZOOM") is, and at all times relevant to this complaint was, a California corporation with primary business offices located in the County of Orange, State of California. Plaintiff alleges that LOCAL ZOOM is the alter ego of 29 PRIME.

15.    Defendant SKY MOTORSPORTS, INC. ("SKY MOTORSPORTS") is, and at all times relevant to this complaint was, a California corporation with primary business offices located at 26841 Del Gado Road, Dana Point, CA 92624. Plaintiff alleges that SKY MOTORSPORTS is the alter ego of 29 PRIME.

16.    Defendant 1 NETWORK, INC. is and at all times relevant to this complaint was doing business in California. Plaintiff alleges that 1 NETWORK, INC. is the alter ego of 29 PRIME and/or the successor corporation to 29 PRIME.

17.    Defendants LOCAL ZOOM, OC LISTING, INC., SKY MOTORSPORTS, and 1 NETWORK, INC are referred to in this complaint together as the "DEFENDANT CORPORATIONS."

18.    Plaintiff is informed and believes that at all times alleged, Defendants were associated or affiliated with one or more of the other Defendants in connection with matters and conduct sued upon herein. Plaintiff alleges that at all times relevant, each Defendant was acting with one or more of the other Defendants pursuant to a common scheme, course of action, enterprise or conspiracy and each defendant is liable to Plaintiff for the events happenings and damages alleged.

19.    Plaintiff is informed and believes and thereon alleges that WALLACE is the controlling shareholder of 29 PRIME and SKY MOTORSPORTS. Plaintiff alleges that WALLACE owns 50% of LOCAL ZOOM. On information and belief, Plaintiff alleges that WALLACE completely controls and profits from OC LISTING and 1NETWORK, INC., but does not own OC LISTINGS or 1 NETWORK INC.

20.    WALLACE's relationship with 29 PRIME and DEFENDANT CORPORATIONS is such that WALLACE's interest and the interests of the various companies are one in the same. WALLACE, 29 PRIME, and DEFENDANT CORPORATIONS act as a single entity and have substantially the same interests.

COMPLAINT

21.    Alternatively, WALLACE is and/or was a promoter of 29 PRIME and DEFENDANT CORPORATIONS and subscriber to the majority of the shares of 29 PRIME and the DEFENDANT CORPORATIONS' stock. The shares owned or subscribed by WALLACE constitute a majority of the total number of shares issued and outstanding or which have been subscribed to.

22.    There exists a unity of interest and ownership between WALLACE 29 PRIME, and DEFENDANT CORPORATIONS such that any individuality or separateness between them has ceased. 29 PRIME and the DEFENDANT CORPORATIONS are the alter ego of WALLACE in that they are mere shells, instrumentalities, and conduits through which WALLACE carried on his business activities in order to perpetrate wrongdoing, commingle corporate funds, misuse corporate assets, and not observe corporate formalities. WALLACE exercised complete control and dominance over 29 PRIME and the DEFENDANT CORPORATIONS to such an extent that any individuality or separateness between them does not exist.

23.    Allowing 29 PRIME and the DEFENDANT CORPORATIONS to be recognized as entities distinct from WALLACE would permit abuse of the corporation privilege. This recognition would produce an inequitable result in that WALLACE has not complied with the requisite corporate formalities of the California Corporations Code. This recognition would also sanction fraud and/or promote injustice in that WALLACE personally benefitted from the agreements undertaken between 29 PRIME and other DEFENDANT CORPORATIONS, as well as knowingly violating California and Federal law for personal gain.

24.    OC LISTING is also the alter ego of 29 PRIME and WALLACE because there exists a sufficient unity of interest between 29 PRIME and OC LISTING. OC LISTING and 29 PRIME operate as a single business enterprise despite their separate corporate status because they operate together with shared resources, shared labor, and common management. On information and belief OC LISTING and 29 PRIME have common ownership. Defendant REDMAN holds officer titles in both entities and Defendant WALLACE is or was the President of OC LISTING and Chief Executive Officer 29 PRIME. WALLACE and REDMAN have control of both entities, and, on information and belief, REDMAN's sister is the majority owner of OC LISTING. OC

LISTING does business as 29 PRIME and has been used to sell 29 PRIME's products since the inception of 29 PRIME and used 29 PRIME's name, logo, and image to market these products to customers.

25.    On information and belief, OC LISTING uses 29 PRIME's operational platform, including the Prime Marketing Platform, dialer, phone system, code, billing platform, and other intellectual property.  On information and belief, OC LISTING uses this platform to enable it to sell products, bill customers, generate reports and financial information.  On information and belief, regardless of OC LISTING's sales to its customers, 29 PRIME's name appears on the credit card charge for each customer.

26.    Plaintiff is informed and believes that OC LISTING and 29 PRIME share or shared the same office space located at 9831 Irvine Center Dr. Ste. #100, Irvine, CA 92618.  29 PRIME and OC LISTING share the same counsel.

27.    29 PRIME has received awards such as "Inc. 500" awards, American Business Awards, and Orange County Business Journal awards, as a result of the commingling assets, funds, and financial information.  FARDI, the CFO of OC LISTING and 29 PRIME, has also given public interviews claiming that she is the CFO of 29 PRIME and has touted the financial accomplishments of 29 PRIME.

28.    OC LISTING is the alter ego of 29 PRIME because it is used to accomplish the wrongful purpose of defrauding creditors, evading liability for violations of state and federal law, and to divert value and money away from 29 PRIME to leave 29 PRIME an empty shell.  This wrongful purpose is in part demonstrated by the conflict of interest that WALLACE maintains, as he acts on behalf of OC LISTING while concurrently being the CEO of 29 PRIME.  This is also demonstrated by WALLACE, acting on behalf of OC LISTING, unilaterally cancelling the licensing agreement between 29 PRIME and OC LISTING in order to devalue 29 PRIME.  On information and belief, the cancellation of this agreement was done after litigation against both entities was pending and was taken in an effort to devalue 29 PRIME in order to further defraud creditors.

29.     1 NETWORK, INC. is the alter ego and/or the successor corporation of 29 PRIME because it is used to accomplish the wrongful purpose of defrauding creditors, evading liability for violations of state and federal law, and to divert value and money away from 29 PRIME to leave 29 PRIME an empty shell.

30.     Due to the unity of interest and wrongful purposes of the entities, treating the acts and conduct alleged herein as the acts and conduct only of the separate corporate entities would create an inequitable result and would deprive Plaintiff of any meaningful recovery and would allow Defendants OC LISTING and 29 PRIME to leave 29 PRIME a valueless shell defrauding creditors. Accordingly, for the purposes of this action, the separate corporate form should be disregarded, and OC LISTING and 29 PRIME be treated as a single enterprise because any separateness has ceased to exist between the two entities.

31.     In a further effort to defraud creditors, Plaintiff is informed and therefore believes and thereon alleges that all of the assets of 29 PRIME were transferred or diverted to 1 NETWORK and 29 PRIME has therefore been left an empty shell.

32.     Plaintiff brings this action derivatively, on behalf of and for the benefit of 29 PRIME so as to accomplish justice for the creditors of 29 PRIME against certain of its officers and directors seeking to remedy WALLACE, REDMAN, MARTIN, and FARDI's violations of California law, including breaches of fiduciary duties, abuse of control, gross mismanagement, violations of federal law, and waste of corporate assets between mid-July 2013 until the present. The actions of WALLACE, REDMAN, MARTIN, and FARDI, have caused substantial losses to 29 PRIME, have caused injury to its goodwill and reputation in the business community, and have subjected it to protracted class action litigation. Plaintiff seeks monetary damages on behalf of the corporation, an Accounting of 29 PRIME and the DEFENDANT CORPORATIONS, and other injunctive relief as may be ordered.

33.     Plaintiff will adequately and fairly represent the interests of 29 PRIME in enforcing and prosecuting the corporation's rights under the derivative suit.

///

///

7

COMPLAINT

**Demand Futility**

34.    Plaintiff alleges that any written demand made to the board of directors to 29 PRIME is futile.    The board of directors is under the complete control and influence of WALLACE. The other members of the board of directors have expressly ratified WALLACE's wrongful activity in the past and remain under the control and influence of WALLACE.

35.    Plaintiff alleges that any demand made to the board of directors would be rejected immediately and not investigated.

36.    Plaintiff alleges that the board of directors is entirely made up of interested individuals who have all profited personally from the unauthorized board resolution.  Plaintiff is informed and believe that WALLACE, REDMAN, MARTIN, FARDI, and Christina Hart have all personally accumulated the distributions owed to Plaintiff and continue to receive these improper distributions through their involvement with OC LISTING and 1 NETWORK.

**FACTUAL ALLEGATIONS**

***ROSENTHAL, WALLACE, REDMAN, and MARTIN Create 29 Prime, Inc.***

37.    Each of the factual allegations below is based on Plaintiff's information and belief.

38.    In or around May 2010, WALLACE called Mike Rosenthal ("ROSENTHAL") and asked to meet.  WALLACE wanted ROSENTHAL to help him grow a new company that they could sell later for a large gain.

39.    WALLACE had a history of questionable behavior, which included breaking leases, changing brands, not meeting important obligations, and violating non-compete agreements. ROSENTHAL agreed to work with WALLACE *only* after WALLACE promised to not engage in any of his past wrongful behavior.

40.    To memorialize his promise, WALLACE agreed to sign a co-founder agreement (the "29 Prime Co-Founder Agreement").  A true and correct copy of which is attached hereto as Exhibit A." The 29 Prime Co-Founder Agreement would allow 29 PRIME to build a reputable, long-lasting, and valuable brand. The 29 Prime Co-Founder Agreement was between 29 PRIME, "including it's [sic] subsidiaries, affiliates, successors, and assigns, or ***any other company in the***

1   *same industry space controlled and owned in large part by Russell Wallace*, (in aggregate

2   "Company" or "29P") . . . and each of 29P's Co-Founders, Russell Wallace, Tony Redman, Mike

3   Rosenthal, and Don Walker."

4       41.    Don Walker was later removed as a Co-Founder because he never signed the 29

5   Prime Co-Founder Agreement. Don Walker was replaced by MARTIN.

6       42.    In or around July 2010, ROSENTHAL and WALLACE formed 29 PRIME along

7   with REDMAN and MARTIN. 29 PRIME was a licensing company which owns SEO intellectual

8   property ("IP.") 29 PRIME licensed the IP to the operating OC LISTING.

9       43.    OC LISTING was chosen as the operating company because it was still an active

10  corporation, had an operating history, and could obtain merchant accounts. A merchant account

11  is an account that allows an entity to receive debit or credit card payments.

12      44.    A licensing agreement (the "29 Prime Licensing Agreement") was put in place

13  between 29 PRIME and OC LISTING. All profits made under the 29 Prime Licensing Agreement

14  were transferred to 29 PRIME and divided amongst ROSENTHAL, WALLACE, REDMAN, and

15  MARTIN based on their respective ownership interests in 29 PRIME. Bills were paid weekly and

16  any remaining profits, if any, were distributed based on percentage ownership.

17      45.    Throughout the life of the company, WALLACE, REDMAN, and other employees

18  took 1099 income instead of W2 income. These individuals, other than ROSENTHAL, also took

19  1099 income from OC LISTING as well as 29 PRIME.

20      46.    Thereafter, 29 PRIME and OC LISTING purchased all assets of WALLACE's

21  other company, YLM. The tangible, physical assets went to OC LISTING while the IP assets went

22  to 29 PRIME.

23      47.    29 PRIME officially launched on October 29, 2010. Since launching the company,

24  OC LISTING and 29 PRIME were listed as two "separate" legal entities. However, the two

25  companies operated as one because of the 29 Prime Licensing Agreement. There was no

26  separation of the two entities as they shared employees, had common management, commingled

27  funds, operated in the same office space, and OC LISTING held itself out as 29 PRIME.

28

COMPLAINT

48.    At the beginning of the company, 29 PRIME had four owners: WALLACE with a 55% interest, ROSENTHAL with a 20% interest, REDMAN with a 20% interest, and MARTIN with a 5% interest.    Stock options were also issued to employees, but at the time of ROSENTHAL's departure, none had been exercised, and many had been forfeited due to employee turnover.

49.    At the time of ROSENTHAL's departure in July 2013, 29 PRIME had five owners: WALLACE with a 55% interest, ROSENTHAL with a 20% interest, REDMAN with a 20% interest, and MARTIN with a 4% interest, and Christina Hart with a 1% interest.

### ***WALLACE Breaches His Fiduciary Duties***

50.    Plaintiff is informed and believe and thereon allege that WALLACE owns 50% of a company called LOCAL ZOOM and that WALLACE receives 50% of the profit from LOCAL ZOOM's business.

51.    Plaintiff is informed and believe and thereon allege that 29 PRIME has or had a reseller commission agreement in place with LOCAL ZOOM.    LOCAL ZOOM's reseller commission agreement is unfairly advantageous and lucrative and is unreasonably more favorable than the ones in place for other resellers. LOCAL ZOOM receives or received roughly double the residual commission of the next highest paid reseller.

52.    Plaintiff is informed and believe and thereon allege that WALLACE was primarily motivated by his controlling interest in LOCAL ZOOM, when he gave LOCAL ZOOM a much more lucrative commission deal than other resellers in order to unjustly benefit himself.

53.    WALLACE did not formally disclose this information to the board of directors in writing.

54.    Plaintiff alleges that WALLACE's structuring of this reseller commission agreement has resulted in a continued depletion of 29 PRIME's revenue and profits.

55.    Due to the patent conflict of interest, ROSENTHAL urged WALLACE to give up his stake in LOCAL ZOOM, but WALLACE refused.  WALLACE offered ROSENTHAL 20%

1   of LOCAL ZOOM's profits to make ROSENTHAL stay quiet about WALLACE'S involvement

2   with LOCAL ZOOM, but ROSENTHAL turned this down.

3        56.     Plaintiff is informed and believes and thereon alleges that WALLACE gave

4   LOCAL ZOOM this extremely lucrative agreement so that he could retain funds over and above

5   what his Co-Founders were making at 29 PRIME.  Plaintiff also alleges that WALLACE arranged

6   this agreement with LOCAL ZOOM so that he could divert funds away from 29 PRIME and into

7   LOCAL ZOOM for his own benefit.

8

9        ***29 PRIME'S Success & WALLACE'S Abuse of Corporate Resources.***

10       57.     In late 2011, WALLACE decided to take a risk and lease a much larger space in

11  order to aggressively grow 29 PRIME's sales capacity.  WALLACE and 29 PRIME leased roughly

12  30,000 square feet in Irvine, California with an option to expand to roughly 45,000 square feet,

13  which they did in early 2012. Their previous office, in Mission Viejo, California, was only 6,000

14  square feet.  Plaintiff is informed and believe that WALLACE, on behalf of 29 PRIME, has since

15  breached this Irvine lease and moved out of the building prior to the end of the lease term.

16       58.     After filling the 45,000 square foot facility, 29 PRIME took off and became very

17  successful.  On October 3, 2012, the *Orange County Business Journal* ranked 29 PRIME as the #1

18  fastest-growing private company in Orange County.  In 2012, "Inc. 500" ranked 29 PRIME at #36

19  for companies with a 3-year revenue growth.  29 PRIME has been in "Inc. 500" for three straight

20  years 2012-2014.  In 2013, 29 PRIME was the "Silver Stevie Winner" at the American Business

21  Awards.

22       59.     When 29 PRIME applied for these awards, it used the shared financial information

23  of OC LISTING because OC LISTING's revenues are much larger.  Plaintiff alleges that any

24  separateness of financial record and books is meaningless.

25       60.     Plaintiff alleges that after July 2013, 29 PRIME began to become increasingly less

26  valuable.  Plaintiff alleges that this devaluation was done by WALLACE, REDMAN, MARTIN,

27  and FARDI by having OC LISTING withhold the amounts owed to 29 PRIME and distributing

28

11

COMPLAINT

1    those funds to themselves through OC LISTING. Plaintiff alleges that this was done to circumvent

2    the obligation to pay 29 PRIME'S creditors.

3        61.      Plaintiff alleges that this was undertaken at the direction of WALLACE,

4    REDMAN, MARTIN, and FARDI to defraud creditors. By failing to transfer the monies owed to

5    29 PRIME under the 29 Prime Licensing Agreement, WALLACE, REDMAN, MARTIN, and

6    FARDI believed that they could avoid paying creditors.

7        62.      As 29 PRIME's profits began to grow, the owners started to make more money

8    commensurate with their ownership interest percentages.

9        63.      Since 29 PRIME's inception, WALLACE used 29 PRIME and OC LISTING

10    corporate funds for his personal use.

11        64.      Plaintiff is informed and believes and thereon alleges that WALLACE had 29

12    PRIME hire a masseuse primarily for WALLACE's personal use. WALLACE had 29 PRIME

13    hire a full-time handyman who spent over a month remodeling WALLACE's house. WALLACE

14    also had 29 PRIME hire a personal assistant who prepared WALLACE's personal taxes, washed

15    his cars, picked up his suits, and coordinated activities at his home.

16        65.      Plaintiff is informed and believe and thereon allege that WALLACE also used

17    company counsel for his personal defense in the *Notaro et al. v. Wallace et al.* case wherein he

18    was being sued individually. This lawsuit was mainly against Wallace as an individual. Plaintiff

19    also alleges that WALLACE had 29 PRIME pay for the eventual settlement.

20        66.      Further, WALLACE abused corporate funds by using Janie McCartney, the sole

21    record owner of OC LISTING, to obtain an Amex credit card for 29 PRIME. Plaintiff is informed

22    and believes and thereon alleges that WALLACE began using this credit card regularly for

23    personal expenses while 29 PRIME paid the bill. Plaintiff is informed and believes and thereon

24    alleges that these charges included personal trips and a home gym.

25        67.      The Amex card used for these personal charges was paid with 29 PRIME'S profits

26    before the remaining profits were split amongst the owners. WALLACE required payments be

27    paid to Amex weekly, prior to profit distributions, even though Amex only billed monthly.

28    Plaintiff is informed and believes and thereon alleges that this was for the purpose of siphoning

1   money out of 29 PRIME. Since profit was distributed weekly, this allowed WALLACE to reduce

2   distributions to the Co-Founders in every pay period, rather than just once every four weeks.

3        68.    Plaintiff is informed and believes and thereon alleges that WALLACE's deduction

4   of personal charges from his own pay, before profits were distributed, amounted to avoiding taxes.

5   ROSENTHAL advised WALLACE against this and hired an in-house attorney and a

6   CPA/Controller to help with these issues. Yet WALLACE consciously disregarded their advice

7   on a number of matters and often had them help him with personal matters.

8        69.    One such matter was the lawful classification of employees. Throughout the entire

9   existence of 29 PRIME, WALLACE insisted on misclassifying employees as independent

10  contractors. WALLACE's insistence was against the advice of counsel, professional staff, and

11  ROSENTHAL.

12       70.    On information and belief, 29 PRIME's misclassification of employees has led to

13  a governmental investigation of 29 PRIME and OC LISTING's labor practices.

14       71.    Another contentious matter was WALLACE and other employees taking 1099

15  income for themselves to avoid tax withholding.

16       72.    As ROSENTHAL's voiced opposition increased to WALLACE's misclassification

17  and payroll practices, the relationship between the two began to deteriorate.

18

19  ***WALLACE, MARTIN, REDMAN, AND FARDI's Continuing Breaches of Fiduciary***

20  ***Duty***

21       73.    Plaintiff alleges that 29 PRIME's interests will be further damaged if the wrongful

22  acts of WALLACE, MARTIN, REDMAN, and FARDI are treated as corporate acts.

23       74.    After July 2013, WALLACE has regularly and systematically used the assets,

24  funds, and resources of 29 PRIME to further his own personal interests in his capacity as

25  controlling shareholder. This includes the creation of new entities, solely owned by WALLACE,

26  formed to hold intellectual property that is rightfully owned and created by 29 PRIME and sell that

27  intellectual property. This is done to divert funds away from 29 PRIME to OC LISTING and 1

28  NETWORK and into the new entities solely owned by WALLACE.

13

COMPLAINT

75.     This diversion of business constitutes a usurping of a corporate opportunity that 29 PRIME has the ability to take advantage of and would, in reality, have pursued but for WALLACE's wrongful actions.

76.     WALLACE continued to use 29 PRIME corporate funds for his personal benefit. This included the continued use of the 29 PRIME American Express card for personal purchases and the use of 29 PRIME funds to hire individuals for personal services.

77.     Likewise, WALLACE continued to maintain a patent conflict of interest by being a majority and controlling shareholder in both LOCAL ZOOM and 29 PRIME. The continued existence of the overly lucrative commission plan in favor of LOCAL ZOOM continued to injure 29 PRIME.

78.     Further, Plaintiff is informed and believes that WALLACE, REDMAN, and MARTIN have willfully engaged in illegal marketing and sales practices in violation of the federal Telephone Consumer Protection Act since July 2013, which has created protracted class action litigation across the country.

79.     Plaintiff is informed and believes that WALLACE continued to engage in illegal labor practices.

80.     Plaintiff is informed and believes that WALLACE, REDMAN, MARTIN, and FARDI are responsible for directing OC LISTING to retain monies that are rightfully owed to 29 PRIME in an effort to defraud 29 PRIME's shareholders and creditors, loot, wreck, and render 29 PRIME valueless.

81.     In October of 2014, FARDI appeared on a webcast interview entitled "CFO Thought Leader." During the interview, FARDI unequivocally stated that she was the CFO of 29 PRIME. At no time did FARDI ever state that she was the CFO of OC LISTING or that she had any involvement with OC LISTING.

82.     FARDI acknowledged that 29 PRIME received many awards for being a fast-growing business. FARDI also acknowledged that 29 PRIME attained a gross revenue of $20,000,000.00, all "without an accounting department, at all, with zero debt, with zero financing"

1   before she joined the company. Several times throughout the interview, FARDI admitted that 29

2   PRIME is a "$20,000,000.00 company."

3       83.     FARDI stated that she began discussing business strategy with WALLACE "a year

4   before [she] joined the company." FARDI officially joined 29 PRIME in November 2013. FARDI

5   stated that she came in to "build the financial infrastructure" for 29 PRIME. Tellingly, in

6   November 2013, 29 PRIME was no longer receiving any substantial revenue under the 29 Prime

7   Licensing Agreement from OC LISTING and was in the process of being transformed into a shell

8   corporation. When asked if FARDI "had the opportunity to actually architect the functions" of 29

9   PRIME, she stated, "absolutely."

10      84.     FARDI admitted that one of the first things she did as CFO of 29 PRIME was

11  "released $600,000.00 of funds" out of the merchant reserve accounts. Plaintiff alleges that these

12  funds were proper distributions to be made to the shareholders of 29 PRIME based on their

13  respective interests in 29 PRIME. However, Plaintiff alleges that these funds were wrongfully

14  retained by OC LISTING, WALLACE, REDMAN, MARTIN, and FARDI and withheld from the

15  shareholders of 29 PRIME.

16      85.     FARDI admitted that within ten (10) months of her being with the company, the

17  company was "up ten percent." NEXTFLOWS alleges that after July 2013, and since FARDI

18  assumed her role as CFO of 29 PRIME, the shareholders of 29 PRIME have not received a single

19  distribution, even though the company was "up ten percent."

20      86.     During the calendar year of 2014, 29 PRIME only had $10.13 of "Total Income"

21  as listed on its profit and loss statement. FARDI served as CFO of 29 PRIME during this time.

22  ///

23

24

25

26

27

28

COMPLAINT

**FIRST CLAIM FOR RELIEF**

**BREACH OF FIDUCIARY DUTY - DERIVATIVE**

*(Plaintiff, on behalf and for the interest of 29 PRIME Against WALLACE, REDMAN, MARTIN,*
*FARDI)*

128.    The allegations of the paragraphs above are re-alleged and incorporated herein by reference as though fully set forth.

129.    As an officer, director, or controlling shareholder of 29 PRIME, WALLACE, REDMAN, MARTIN, and FARDI, owed, at all times relevant herein, fiduciary duties to protect the interest of 29 PRIME, including, but not limited to, the duties of care, loyalty, honesty, candor, and disclosure. WALLACE, REDMAN, MARTIN, and FARDI were all principals of a corporate Chapter 7 debtor, and owed fiduciary duties to the Estate and its creditors.

130.    Case law provides that a chapter 7 "debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession." *In re Perez*, 30 F.3d 1209, 1214 fn. 5 (9th Cir. 1994); *see also Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985).

131.    Plaintiff is informed and believes, and thereon alleges that WALLACE, REDMAN, MARTIN, and FARDI breached their fiduciary duties by, among other things, planning, authorizing, organizing, and directing the improper transfers described above for their benefit, and by acting contrary to the interests of the corporation, by interfering with and damaging 29 PRIME's financial well-being.

132.    As a direct, proximate, and foreseeable result of WALLACE, REDMAN, MARTIN, and FARDI's breaches of fiduciary duties, 29 PRIME has been substantially deprived of assets, opportunities, and prospects, and the value of 29 PRIME and the Estate has been diminished.

133.    By taking the action set forth hereinabove, WALLACE, REDMAN, MARTIN, and FARDI breached the fiduciary duties they owed to the Estate and 29 PRIME's creditors.

134. Plaintiff is informed and believes, and thereon alleges, that as a direct result of WALLACE, REDMAN, MARTIN, and FARDI's breaches of their fiduciary duties, Plaintiff and the Estate have been damaged by being forced to expend attorneys' fees and costs.

135. WALLACE, REDMAN, MARTIN, and FARDI owe and owed 29 PRIME a fiduciary obligation, which by reason thereof, includes the highest obligation of good faith, fair dealings, loyalty, and due care.

136. As a result of WALLACE, REDMAN, MARTIN, and FARDI's acts alleged herein from mid-July 2013 to the present, including but not limited to, breaches of fiduciary duties of care by maintaining a conflict of interest that has substantially harmed the revenue and value of 29 PRIME, resulting in 29 PRIME's Chapter 7 bankruptcy filing, self-dealing to divert funds away from 29 PRIME into OC LISTING, 1 NETWORK and other entities allegedly owned by WALLACE, misusing corporate assets for personal benefits, and engaging in illegal and dishonest business practices in violation of California and federal law, all of which involved a knowing and culpable violation of duty, absence of good faith, dishonesty, and a reckless disregard towards 29 PRIME and its shareholders to which WALLACE, REDMAN, MARTIN, and FARDI were aware, or should have been aware.

137. Further, REDMAN, MARTIN, and FARDI have breached their fiduciary duty of care by failing to use reasonable efforts to inform themselves of WALLACE's wrongful dealings, relationships, policies, actions, and their subsequent negative effects on the corporation. REDMAN, MARTIN, and FARDI have also breached their fiduciary duties by directing OC LISTING, in concert with WALLACE, to retain the funds rightfully owed to 29 PRIME under the 29 Prime Licensing Agreement in order to devalue 29 PRIME and further defraud the creditors of 29 PRIME.

### Conflict of Interest, Misuse of Corporate Assets, and Self-Dealing

138. WALLACE's concurrent role as controlling shareholder of 29 PRIME, President and controller OC LISTING, and as 50% owner of LOCAL ZOOM created a conflict of interest which prevents him from freely pursuing the best interests of 29 PRIME. This conflict of interest

1  does not allow 29 PRIME the equal opportunity to benefit from the agreements and transaction

2  between the 29 PRIME, OC LISTING, and LOCAL ZOOM.

3      139.  This conflict is further demonstrated by WALLACE's continued personal benefit

4  from the LOCAL ZOOM and 29 PRIME commission agreement.  Plaintiff is informed and

5  believes and thereon alleges that WALLACE is a 50% shareholder in LOCAL ZOOM, and that

6  because of his ownership, LOCAL ZOOM receives a much more lucrative commission deal than

7  other resellers.  WALLACE directly benefits from LOCAL ZOOM's proceeds at the expense of

8  29 PRIME.

9      140.  WALLACE continued to misuse corporate assets for his own personal use.  This

10  includes using the American Express credit card for personal purchases paid for by corporate

11  funds, using corporate funds for legal defenses and settlements, and misusing corporate funds by

12  purchasing vehicles from SKY MOTORSPORTS which is wholly owned by WALLACE.

13      141.  WALLACE, REDMAN, MARTIN, and FARDI also maintain a patent conflict of

14  interest by their concurrent involvement in 29 PRIME and OC LISTING.  WALLACE,

15  REDMAN, MARTIN, and FARDI are in management roles in both corporations and cannot fairly

16  represent the best interest of 29 PRIME because of this concurrent involvement.

17      142.  As a direct and proximate result of WALLACE, REDMAN, MARTIN, and

18  FARDI's failure to honor their fiduciary obligations, 29 PRIME has sustained significant damages,

19  resulting in 29 PRIME's chapter 7 bankruptcy filing.  As a result of the misconduct alleged herein,

20  WALLACE, REDMAN, MARTIN, and FARDI are liable to the Estate for such compensatory

21  damages in an amount to be proven at trial and above the jurisdictional limit.

22      143.  As a result of WALLACE, REDMAN, MARTIN, and FARDI's actions, Plaintiff

23  is entitled to relief in the form of disgorged profits from WALLACE, REDMAN, MARTIN, and

24  FARDI's self-dealing, conflict of interest, abuse of power, and misuse of corporate funds.

25      144.  Plaintiff is also entitled to compensatory damages for 29 PRIME corporate funds

26  used by WALLACE for his own personal benefit.

27      145.  Plaintiff, as derivative Plaintiff, is also entitled to attorney fees under the California

28  Corporations Code.

146.    As a result of all of WALLACE, REDMAN, MARTIN, and FARDI's breaches of fiduciary duties, in toto, the Estate sustained financial losses in an amount according to proof at the time of trial. Such damages are ongoing.

147.    In doing the acts alleged, WALLACE, REDMAN, MARTIN, and FARDI acted intentionally and willfully with the intent to injure 29 PRIME with malice, fraud, and oppression. As a result, 29 PRIME seeks punitive and exemplary damages as provided by Section 3294 of the California Civil Code in an amount sufficient to punish WALLACE, REDMAN, MARTIN, and FARDI and to deter such conduct in the future.

## SECOND CLAIM FOR RELIEF

## CONSTRUCTIVE TRUST

*(PLAINTIFF against LOCAL ZOOM, OC LISTING, SKY MOTORSPORTS, and 1 NETWORK)*

148.    The allegations of the paragraphs above are re-alleged and incorporated herein by reference as though fully set forth.

149.    As stated above, LOCAL ZOOM, OC LISTING, SKY MOTORSPORTS, and 1 NETWORK are either the alter ego or successor corporation of 29 PRIME.

150.    LOCAL ZOOM, OC LISTING, SKY MOTORSPORTS, and 1 NETWORK have gained monetary funds as a result of WALLACE, REDMAN, MARTIN, AND FARDI'S breaches of fiduciary duties, self-dealing, fraud, and conflicts of interest. These monetary funds are in the form of wrongfully acquired revenue. LOCAL ZOOM, OC LISTING, SKY MOTORSPORTS, and 1 NETWORK have no legal or equitable right, claim or interest in 29 PRIME's funds, but, instead, Defendants LOCAL ZOOM, OC LISTING, SKY MOTORSPORTS, and 1 NETWORK are involuntary trustees holding said revenue and profits therefrom in constructive trust for 29 PRIME with the duty to convey the same to Plaintiff forthwith.

## IV.    PRAYER FOR RELIEF

162.    For general damages according to proof;

163.    For punitive damages according to proof;

164.    For costs incurred by Plaintiff including reasonable attorney fees and costs in suit in obtaining the benefits due Plaintiff; and

COMPLAINT

1    165.    For such other and further relief the Court deems just and proper.

2    **V.    DEMAND FOR JURY TRIAL**

3    Plaintiff hereby respectfully demands trial by jury to the fullest extent of the law.

4

5    Dated: November 3, 2017                    Amezcua-Moll & Associates, P.C.

6
                                      By: _____
7
                                          Rosemary Amezcua-Moll
8                                         Sarah J. Nowels
                                          Attorneys for Plaintiff, Chapter 7 Trustee,
9                                         RICHARD A. MARSHACK

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

# EXHIBIT A

**29 Prime, Inc.**

### Co-Founder Agreement

This agreement ("Agreement") is made by and between **29 Prime, Inc.**, a Nevada corporation, including it's subsidiaries, affiliates, successors, and assigns, or any other company in the same industry space controlled and owned in large part by Russell Wallace, a (in aggregate "Company" or "29P") whose address is 15520 Rockfield Boulevard, Ste 200, Irvine, CA 92618, and each of 29P's Co-Founders, **Russell Wallace, Tony Redman, Mike Rosenthal, and Don Walker** ("Contractors" or "Co-Founders").

### WITNESSETH:

WHEREAS, 29P is in the business of providing local and other search engine optimization and placement services; and

WHEREAS, 29P and Co-Founders desire that Co-Founders provide various leadership, support, and other services designed to increase the sale of 29P products and services (collectively, the "Services"), and the value of 29P as an entity.

NOW, THEREFORE, In consideration of the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

### Services
Co-Founders will serve in the following key roles, Russell Wallace shall be Chief Executive Officer ("CEO"), Tony Redman will serve as Chief Operating Officer ("COO"), Mike Rosenthal shall serve as Chief Development Officer ("CDO"), and Don Walker shall be General Counsel ("GC"). Each will not only oversee their functional areas, but collectively will provide direction and leadership to the company in general, and shall play key roles in strategic decision-making for the Company. This Agreement shall be effective as of July 28, 2010 (the "Effective Date") and it shall continue indefinitely, unless terminated pursuant to the terms set forth herein. In any disagreement between the Co-Founders, the outcome shall be determined based on equity ownership.

### Compensation
29P will pay to Co-Founders no fixed amount of wages initially. Company shall pay Contractors on the basis of available profit only, unless at some later time, at Company's sole discretion, Company decides to pay fixed wages to Co-Founders. Profit-sharing amounts shall be distributed on a weekly basis, to the extent profits are available to distribute. Payments shall be determined based on the amount of profit Company decides to distribute for that week, times the ownership percentage owned by each Co-Founder. Payments may be made in the form of dividends, contractor payments, or wages, to be determined by 29P and Co-Founder. Shares shall be issued to Co-Founders within two weeks of execution of this Agreement, provided Co-Founder has signed this agreement. Co-Founders shall be granted founder shares equal to each Co-Founder's percent ownership of the total outstanding shares at the date of issuance. All founder shares shall be issued at once, and there will be no more founder shares issued. Subsequent share issuances will require the prior consent of eighty percent ("80%") or more of the Co-Founder shares. If a Co-Founder voluntarily leaves Company prior to a significant change in ownership, defined as any change in ownership of twenty-five percent ("25%") or greater, or a change in control, Co-Founder will forfeit

Co-Founder Agreement
July 28, 2010
Page 2

fifty percent ("50%") of his shares to Company treasury stock. Consequently, such shares have significant risk of forfeiture. If Co-Founder is asked by Company to leave, or a change in ownership or control takes place, as defined above, Co-Founder shall keep all his shares regardless of whether or not he is still providing services to the company.

The Co-Founder shares shall be divided as follows, provided they sign the Co-Founder Agreement. Russell Wallace shall receive fifty-five percent ("55%"). Tony Redman shall receive twenty percent ("20%"). Mike Rosenthal shall receive twenty percent ("20%"). Don Walker shall receive five percent ("5%").

It is envisioned that a stock option plan will be developed and approved, to create equity participation for future employees and service providers. Co-Founders authorize an additional five percent ("5%") of Co-Founder shares to be allocated for stock option grants. Any forfeited options may be re-issued. Additional option grants shall required a majority vote of the board of directors.

It is hereby acknowledged that the equity provided per this agreement is founder equity. Since Company, at inception, had no material value yet created, it is hereby acknowledged and agreed by all parties, that the Co-Founder share grants contain no value at issuance. Such value has to be created. With the above acknowledgement, and the fact the founder shares contain significant risk of forfeiture, it is acknowledged and agreed that the grant of founder shares is not intended to be a taxable event.

## Restrictions on Transfer

The shares of common stock will be subject to significant restrictions against transfer. The shares will not be transferable to any party other than a sale to 29P, the issuing company, at a mutually agreeable price, unless and until more than 25% the company is either sold, or the shares have been registered in conjunction with a public offering, in which case the restrictions on transferability of shares shall then be eliminated. An exception to this rule shall exist in cases where the Co-Founder wishes to transfer his shares to a trust, LLC, or Corporation, which is in his control. Once transferred, the same restrictions on transfer shall apply to the Co-Founder-controlled entity, unless the shares are transferred back to the Co-Founder.

These restrictions on transfer will also include the provisions of SEC Rule 144, unless and until registration is effected by 29P. Any transfer of shares must be made pursuant to an effective registration under the Securities Act of 1933 (the "Securities Act"), as amended and any applicable state securities laws, or pursuant to an exemption from such registration, and if reasonably requested by the Corporation, a written opinion of legal counsel, which shall be reasonably satisfactory YLM and its counsel, to the effect that the proposed transfer of shares may be effected without registration under the Securities Act and any applicable state securities laws.

The Shares issued pursuant herewith shall be subject to "Drag-Along Rights" by which, if the holders of at least 51% of the outstanding and issued Common Shares individually or collectively (the "Majority Shareholders"), receive an offer from a person or entity other than an affiliate of any shareholder (a "Third Party") to purchase their Common Shares (representing more than 51% of the then outstanding Common Shares), and such offer is accepted by the Majority Shareholders, then the Co-Founders and each of the other Shareholders and any assignees ("Minority Participants")

Co-Founder Agreement
July 28, 2010
Page 3

hereby agree that, if requested by the Majority Shareholders, they shall transfer to such Third Party, on the same terms and conditions (including time of payment and form of consideration) for all vested equity allocations as to be paid and given to the Majority Shareholders.

## Term & Benefits

Co-Founder services to 29P will be "at will," meaning that either you or 29P will be entitled to terminate your services at any time and for any reason, with or without cause and with or without advance notice. Any contrary representations which may have been made to you are superseded by this offer. This is the full and complete agreement between you and 29P on the terms of your services. Although your duties, title, compensation and benefits, as well as 29P's policies and procedures, may change from time-to-time, the "at will" nature of your services may only be changed in an express written agreement.

You will be entitled to the same benefits offered to other Co-Founders, including enrollment in Company health insurance program, with 29P paying the total cost of the insurance provided to you from the program once offered. You will receive paid vacation per the company policy, and will be paid for Company designated holidays. Other benefits will be provided in accordance with YLM policy, as amended from time to time.

All parties agree 29P will obtain General Liability Insurance ("GLI") and Director and Officer Insurance ("D&O") within four ("4") weeks of executing this agreement.

## Equipment

Any equipment or tangible property provided to the Co-Founder is loaned for the purposes of doing 29P business, and remains the property of Company. The Co-Founder is obligated to return any and all equipment immediately upon termination of this agreement for any reason.

## Expenses

All expenses incurred by Co-Founder in the course of its performance of its duties and obligations under this agreement shall be borne by him, except expenses incurred while traveling at the request of Company.

## Proprietary Information

All information supplied to Co-Founder is provided to enable the Co-Founder to provide services to 29P and remain the sole property of 29P. All work products, including software and other intellectual property developed by or with the assistance of Co-Founder in his capacity hereunder will be owned exclusively by and remain the exclusive property of 29P, and Co-Founder shall have no rights therein. Co-Founder acknowledges that in the course of performing the services contemplated by this Agreement Co-Founder will have access to, and become acquainted with, various trade secrets ("Trade Secret") concerning the business, practices, policies and procedures of 29P. A Trade Secret consists of any information, process or idea that is not generally known to persons outside the Company, which the Company considers confidential, and which gives the Company a competitive advantage. The Employee agrees not to make unauthorized disclosure of or use any such Trade Secret or other proprietary data for any other purpose, during the term of this Agreement and for a one (1) year period following its expiration.

Co-Founder Agreement
July 28, 2010
Page 4

## No Competition

If a Co-Founder terminates this agreement with 29P, he agrees not to pursue or target 29P clients or customers for the term of one year. Unless specifically authorized, Co-Founder will not perform work for any other company, entity or individual providing search engine optimization services or other services similar to those provided to customers by 29P, while providing services to 29P.

## Assignment

This agreement and the rights, duties and obligations hereunder, may not be assigned by either party hereto without the express prior written consent of the other party hereto.

## Indemnification

Co-Founders and 29P hereby agree to indemnify and hold harmless each other, including assigns, partners, directors, officers, shareholders, parent companies, and affiliates, from any and all claims, liabilities, causes of action, damages, judgments, attorney's fees, court costs, and expenses, unless related to enforcing the provisions of this agreement. Co-Founders and Company understand and acknowledge that this obligation of indemnification survives the expiration or termination of this agreement.

## Arbitration.

Except as otherwise provided in this Agreement, any controversy between the parties arising out of this Agreement shall be submitted to and administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures for arbitration in Orange County, California. The costs of the arbitration, including any JAMS administration fee, the arbitrator's fee, and costs for the use of facilities during the hearings, shall be borne equally by the parties to the arbitration. Attorneys' fees may be awarded to the prevailing or most prevailing party at the discretion of the arbitrator. The provisions of Sections 1282.6, 1283, and 1283.05 of the California Code of Civil Procedure apply to the arbitration. The arbitrator shall not have any power to alter, amend, modify or change any of the terms of this Agreement nor to grant any remedy which is either prohibited by the terms of this Agreement, or not available in a court of law. Judgment on the award may be entered in any Court having jurisdiction, unless the time is extended by stipulation of the parties or by order of the arbitrators made for good cause shown, the arbitrators shall render their award not later than one hundred eighty (180) days from the date of their appointment. The award shall be in writing and shall set forth the reason for the arbitrators' decision on each issue in sufficient detail so as to enable the parties to understand the factual and legal base for the decision. Either party may seek preliminary relief from an appropriate court located in Orange County, California, until the arbitrator has issued an award or otherwise ruled. Should it become necessary for either party to commence a court proceeding to enforce this arbitration use or seek preliminary relief, the party doing so shall be entitled to payment of its court costs and reasonable attorneys fees in obtaining an order of the court for arbitration, preliminary relief, entry of judgment on an arbitration or enforcement of any arbitration award.

Exhibit A, Page 24
MRNF000054

Co-Founder Agreement
July 28, 2010
Page 5

## Governing Law

This Agreement shall be governed by and construed in accordance with the laws of the State of Nevada applicable to contracts made and to be fully performed in Nevada.

## Interpretation

Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against one party whether under any rules of construction or otherwise. On the contrary, this Agreement has been negotiated by and between both parties, who obtained or had the opportunity to obtain the advice of their independent attorneys, and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of the parties hereto. In the event any claim is made by any party relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular party or his counsel.

## Attorneys' Fees

If any legal action or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing Party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding in addition to any other remedies to which it may be entitled at law or equity.

## Modifications, Cancellation or Separation

The terms of this agreement may be modified only through a written agreement between 29P and all Co-Founders. Any Co-Founder may terminate this agreement at any time. In the event of termination, the Co-Founder will be compensated as provided for above for all services which have been provided prior to the effective date of such termination.

Executed this 28st day of July, 2010

Russell Wallace
CEO and Co-Founder

Tony Redman
COO and Co-Founder

Mike Rosenthal
CDO and Co-Founder

Don Walker
GC and Co-Founder

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Rosemary Amezcua-Moll SBN 223875<br>Rose@amalaw.net<br>Sarah J. Nowels, SBN 273471<br>Sarah@amalaw.net<br>AMEZCUA-MOLL & ASSOCIATES, P.C.<br>1122 East Lincoln Avenue, Suite 203<br>Orange, CA 92865<br>Telephone: 714-288-2826<br>Facsimile: 714-464-4536<br><br><br>*Attorney for Plaintiff* | |

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| In re:<br><br>29 PRIME, INC.,<br><br><br><br>Debtor(s). | CASE NO.: 8:16-bk-12895-ES<br><br>CHAPTER: 7<br><br>ADVERSARY NO.: |
|---|---|
| RICHARD A. MARSHACK, Chapter 7 Trustee,<br><br><br><br>Plaintiff(s)<br><br>Versus<br>RUSSELL B. WALLACE, an individual; TONY REDMAN, an individual; JASON MARTIN, and individual; HALEH FARDI, an individual; LOCAL ZOOM, INC., a California Corporation; OC LISTING, INC., a California Corporation; and SKY MOTORSPORTS, INC., a California Corporation; 1Network, Inc., entity status unknown     Defendant(s) | **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]** |

TO THE DEFENDANT: A Complaint has been filed by the Plaintiff against you. If you wish to defend against the Complaint, you must file with the court a written pleading in response to the Complaint. You must also serve a copy of your written response on the party shown in the upper left-hand corner of this page. The deadline to file and serve a written response is _____. If you do not timely file and serve the response, the court may enter a judgment by default against you for the relief demanded in the Complaint.

A status conference in the adversary proceeding commenced by the Complaint has been set for:

| Hearing Date: _____ | Address: |
|---|---|
| Time: _____ | ☐ 255 East Temple Street, Los Angeles, CA 90012 |
| Courtroom: _____ | ☐ 3420 Twelfth Street, Riverside, CA 92501 |
| | ☒ 411 West Fourth Street, Santa Ana, CA 92701 |
| | ☐ 1415 State Street, Santa Barbara, CA 93101 |
| | ☐ 21041 Burbank Boulevard, Woodland Hills, CA 91367 |

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

**You must comply with LBR 7016-1, which requires you to file a joint status report and to appear at a status conference.**  All parties must read and comply with the rule, even if you are representing yourself.  You must cooperate with the other parties in the case and file a joint status report with the court and serve it on the appropriate parties at least 14 days before a status conference.  A court-approved joint status report form is available on the court's website (LBR form F 7016-1.STATUS.REPORT) with an attachment for additional parties if necessary (LBR form F 7016-1.STATUS.REPORT.ATTACH).  If the other parties do not cooperate in filing a joint status report, you still must file with the court a unilateral status report and the accompanying required declaration instead of a joint status report 7 days before the status conference.  **The court may fine you or impose other sanctions if you do not file a status report. The court may also fine you or impose other sanctions if you fail to appear at a status conference.**

KATHLEEN J. CAMPBELL
CLERK OF COURT

Date of Issuance of Summons and Notice of Status Conference in Adversary Proceeding: _____

By: _____
            Deputy Clerk

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

December 2016                                    Page 2                              F 7004-1.SUMMONS.ADV.PROC

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

1122 E Lincoln Ave., Suite 203, Orange, CA 92865

A true and correct copy (1) of the foregoing document entitled: **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]** and (2) the accompanying pleading(s) entitled:

COMPLAINT FOR: (1) Breach of Fiduciary Duty - Derivative; (2) Constructive Trust

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _____11/11/2017_____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:
- Rosemary Amezcua-Moll --   sarah@amalaw.net, rose@amalaw.net, amanda@amalaw.net
- Richard L. Barnett --   rick@barnettrubin.com, kelly@barnettrubin.com
- Caroline Djang --   cdjang@rutan.com
- Richard A. Marshack --   pkraus@marshackhays.com, rmarshack@iq7technology.com
- Joseph M. Welch --   jwelch@buchalter.com, dcyrankowski@buchalter.com, ahorowitz@buchalter.com
- United States Trustee --  ustpeggion16.sa.ecf@usdoj.gov        ☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) ___11/10/2017___, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Honorable Erithe A. Smith
United States Bankruptcy Court
411 West Fourth Street, Suite 6135
Santa Ana, CA 92701-459

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 11/11/2017 | Rosemary Amezcua-Moll | /s/ Rosemary Amezcua-Moll |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

B104 (FORM 104) (08/07)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS RICHARD A. MARSHACK, Chapter 7 Trustee | DEFENDANTS RUSSELL B. WALLACE, an individual; TONY REDMAN, an individual; JASON MARTIN, and individual; HALEH FARDI, an individual; LOCAL ZOOM, INC., a California Corporation; OC LISTING, INC., a California Corporation; and SKY MOTORSPORTS, INC., a California Corporation; 1Network, Inc., entity status unknown |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.) Rosemary Amezcua-Moll SBN 223875, Sarah Nowels SBN 273471; AMEZCUA-MOLL & ASSOCIATES, P.C.; 1122 E Lincoln Ave Suite 203, Orange, CA 92865; Tel: 714-288-2826, Fax: 714-464-4536 | ATTORNEYS (If Known) |

| PARTY (Check One Box Only) □ Debtor    □ U.S. Trustee/Bankruptcy Admin □ Creditor    □ Other ☒ Trustee | PARTY (Check One Box Only) □ Debtor    □ U.S. Trustee/Bankruptcy Admin □ Creditor    ☒ Other □ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Breach of Fiduciary Duty (Derivative Action); Constructive Trust

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
2 ☒ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
1 ☒ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☒ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☒ Check if a jury trial is demanded in complaint | Demand $ |
| Other Relief Sought | |

B104 (FORM 104) (08/07), Page 2

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>29 PRIME, INC. | BANKRUPTCY CASE NO.<br>8:16-bk-12895-ES | |
| DISTRICT IN WHICH CASE IS PENDING<br>CENTRAL DISTRICT OF CALIFORNIA | DIVISION OFFICE<br>SANTA ANA DIVISION | NAME OF JUDGE<br>HON. ERITHE A. SMITH |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF<br>Not applicable. | DEFENDANT<br>Not applicable. | ADVERSARY<br>PROCEEDING NO.<br>Not applicable. |
| DISTRICT IN WHICH ADVERSARY IS PENDING<br>Not applicable. | DIVISION OFFICE<br>Not applicable. | NAME OF JUDGE<br>Not applicable. |

| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | |
|---|---|
| /s/ Rosemary Amezcua-Moll | |
| DATE<br>November 10, 2017 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Rosemary Amezcua-Moll |

### INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.